Allen S. GEORGE and Dillard LaRue
et al.

v.

Roger LeBLANC, Jules LeBlanc and P.
J. LeBlanc et al.

Civ. A. No. CA–3–76–0456–G.

United States District Court,
N. D. Texas,
Dallas Division.

March 15, 1977.

Sam J. Day, Patrick Barbolla, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., Geo. B. Mickum, III, Calvin Cobb, Robert E. McLaughlin, Steptoe & Johnson, Washington, D. C., for Allen S. George, Jr., and Dillard R. LaRue, et al.

Frank G. Newman, Newman, Shook & Newman, Tom Max Thomas, N. Henry Simpson, III, Kolodey & Thomas, Dallas, Tex., for Wm. J. Kraus, M.D., and Joe T. Fox.

Richard E. Brodsky, Anthony W. Djinis, Securities & Exchange Commission, Washington, D. C., for SEC.

Michael S. Allred, Satterfield, Allred & Colbert, Jackson, Miss., for plaintiffs.

John L. Hauer, Michael Lowenberg, Emil Lippe, Jr., Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for P. J. LeBlanc.

R. B. Cousins, Tom Owen, Thompson, Coe, Cousins & Iron, Dallas, Tex., for Jesse E. LeBlanc, II.

John D. Crawford, Dallas, Tex., for Harold G. Rhodes.

J. Carlisle DeHay, Jr., Paul L. Smith, Gardere, Porter & DeHay, Dallas, Tex., for J. Burton LeBlanc and Oil and Marine Corp. of Louisiana.

Robert A. Baker, Ronald L. Brown, Richard E. Young, Baker, Glast, Riddle & Tuttle, Dallas, Tex., for American Commonwealth Financial Corp., Great Commonwealth Life Ins. Co., and American Commonwealth Investment Corp.

John O. Jones, Rick J. W. Graham, Dallas, Tex., for Charest Thibaut, Jr.

Wm. J. Hamlin, Benjamin R. Slater, Jr., Monroe & Lehman, New Orleans, La., Harold Hoffman, Geo. H. Kolb, Wynne & Jaffe, Dallas, Tex., for Rodolfo J. Aguilar, Centram Industrial, Ltd., Jayco S.A., and ADH Systems.

Charles Brown, Dibrell, Dibrell, Greer & Brown, Galveston, Tex., Richard Keeton, J. C. Nickens, Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., H. Dudley Chambers, C. Steve Matlock, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for American National Life Ins. Co.

J. Randolph Harger, pro se.

John E. Castle, Jr., Baton Rouge, La., for Jules B. LeBlanc, II, Wego Corporation, Corporation Communications Group, Inc., Corporate Hotel, Inc., Corporate Three, Inc., Mortgage Placement Corporation, and Valley's, Inc.

Wm. H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D. C., Van Mayhall, Breazeale, Sachse & Wilson, Baton Rouge, La., for Roger J. LeBlanc and King Richard, Inc.

Donn Moss, Hebert & Moss, Baton Rouge, La., for First Republic Life Ins. Co.

Tom F. Phillips, Fredrick R. Tulley, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for American Resources Limited, Commonwealth Securities Corp., and Frank Maraist, Receiver for Commonwealth Securities.

## MEMORANDUM OPINION

HIGGINBOTHAM, District Judge.

### INTRODUCTION

The court finds plaintiffs Kraus and Fox adequately and fairly represent the interests of the minority shareholders of ACFC and GCL. The second group of plaintiffs, less Allen S. George, Dillard R. LaRue, and A. L. Pinkston, may also proceed derivatively. The Motion to Disqualify Counsel is denied, and Sam Day and Frank Newman shall be lead counsel for plaintiffs.

### FACTS [1]

The court carved these preliminary issues from a derivative suit involving a Dallas corporation, Great Commonwealth Life Insurance Company (GCL), and its publicly owned holding company, American Commonwealth Financial Corporation (ACFC). Arnold Reed, President and owner of 28% of the stock in GCL, died on January 21, 1974. His death triggered a series of maneuvers to retain control of the corporations by George and LaRue, the new President and Chairman of the Board, respectively. Their efforts were thwarted in April, 1975, when defendant Roger J. LeBlanc, purchaser of the Reed estate stock, was elected Chairman of the Board and chief executive officer of GCL. Although George remained president until June, 1975, Roger LeBlanc immediately began to assume control of GCL's operations. GCL soon after Roger LeBlanc took office embarked upon a series of acquisitions and other transactions which are the subject of this suit. Many of the transactions in question, including consultations by the ACFC Board regarding a proxy statement, were carried out during the time that George, LaRue and Pinkston were directors. George and LaRue voted for four of the allegedly fraudulent actions. Pink-

1. All parties stipulated that the court would find from the record submission all "facts" necessary to the resolution of the Rule 23.1 threshold question as well as related questions raised by defendants' motion to disqualify plaintiffs' counsel. Accordingly, this memorandum constitutes the court's findings of fact and law.

ston, a director of GCL but not ACFC, approved the initial handling of the Republic Securities transaction. In May, 1975, George and LaRue employed McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, a Ft. Worth law firm, to advise them on the legality of a proposed proxy statement. The law firm wrote three opinion letters addressed to George and LaRue but also delivered to the Board of Directors during a series of board meetings in June, 1975. George and Pinkston were not re-elected to, and LaRue resigned from the GCL Board in late August, 1975. In December, 1975, both George and LaRue were requested to resign from the ACFC Board and promptly did so.

Two groups of shareholders attempt to assert ACFC's and GCL's interests against defendants. George, LaRue and Pinkston head the first group, which includes eight shareholders from Pinkston's hometown of Center, Texas. George and LaRue have played an active role in pursuing this suit. The George group has retained McDonald, Sanders[2] as their counsel. They filed suit on March 29, 1976.

Kraus and Fox, the other group, each own a small percentage of ACFC stock. Both assert willingness to pursue the action, and to bear expenses, but neither has assumed the role of an active participant. They have retained Frank Newman and Tom Thomas as their counsel. Before filing suit on March 29, 1976, Kraus and Fox and their attorneys on separate occasions discussed the affairs of ACFC with Stewart Frazer, former General Counsel of ACFC. Frazer gave Frank Newman a copy of "Form A" application of Roger LeBlanc, and a copy of the ownership structure of ACFC. The "Form A" application was defendant Roger LeBlanc's application to the State Board of Insurance for acquisition of controlling interest in the companies, approved by the Board in April, 1975. After suit was filed, Frazer gave Newman a copy of a contract between GCL and Allen George.

All Plaintiffs allege LeBlanc and the other individual defendants in the course of their actions violated Section 10(b) of the Securities and Exchange Act of 1934, certain laws of the States of Texas and Delaware, and fiduciary duties owed by one or more of the defendants to the corporation. The Kraus plaintiffs also allege proxy violations under Section 14 of the Securities and Exchange Act of 1934, in connection with the August, 1975, proxy statement. In sum, plaintiffs charge that defendants' course of conduct defrauded the corporation to defendants' personal benefit. To focus inquiry, the following questions may be posed:

I. Are plaintiffs adequate representatives of all shareholders of ACFC?

A. George Plaintiffs.

(1) Are the George plaintiffs estopped from suing derivatively on certain transactions in which George, LaRue, or Pinkston acquiesced?

(2) What is the importance of the differing approach of the two shareholder groups with regard to possible proxy violations?

(3) Do George and LaRue seek to utilize this suit to regain control of ACFC, and to cover any past acts of mismanagement? If so, do these individual motivations conflict with interests of shareholders they would represent?

B. Have Kraus and Fox abdicated to their attorneys their responsibility as representative plaintiffs?

II. Should counsel for named plaintiffs be disqualified?

A. Did McDonald, Sanders and ACFC ever have an attorney-client relationship?

B. Did Kraus and Fox or their attorneys obtain confidential information concerning ACFC from Stewart Frazer?

C. Are the derivative plaintiffs asserting interests adverse to those of ACFC, and if so, do the individual defendants have standing to assert a motion to disqualify on behalf of ACFC?

---

**2.** Also assisting are Steptoe & Johnson, a Washington, D. C. firm.

## I.

### ADEQUATE REPRESENTATION

■ This is a derivative suit proceeding under Rule 23.1 Fed.R.Civ.P. In winding through the labyrinthian logic of this case, there is hazard in losing sight of the hornbook principles that the right asserted is that of the corporation, not the individual plaintiff, and any shareholder *may* be qualified to sue on behalf of the corporation, regardless of how few shares are owned. Rule 23.1 provides in pertinent part:

> "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."

The burden of showing inadequate representation falls on the defendant. *Smallwood v. Pearl Brewing Company*, 489 F.2d 579, 592 n. 15 (5th Cir. 1974), cert. denied 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

A test for judging adequacy of representation is:

> "If, from the foregoing, the rule might be synthesized it is: [A] when a derivative plaintiff demonstrates to the court an intent and desire to vigorously prosecute the underlying corporate claim, and [B] when he has engaged competent counsel to assist in that endeavor then, absent either [C] a conflict of interest which goes to the forcefulness of the prosecution or the [D] existence of antagonism between the plaintiff and other shareholders arising from differences of opinion concerning the best method of vindicating the corporate claim, the representation requirement of Rule 23.1 is met." (f. n. omitted) *Sweet v. Bermingham*, 65 F.R.D. 551, 554 (S.D.N.Y.1975)

### A. *George, LaRue, and Pinkston are not representative derivative plaintiffs.*

"[T]here is considerable federal and nonfederal authority that if plaintiff has acquiesced or participated in the act or acts made the basis of the cause of action, he is persona non grata as a plaintiff." 3B *Moore's Federal Practice*, ¶ 23.1.17 at p. 23.1–70. Such a person is not a good plaintiff because he is estopped from suing derivatively if he has "acquiesced in the wrong complained of." 7A *Wright & Miller, Federal Practice and Procedure*, § 1834 at p. 398, 1972.

The George plaintiffs argue acquiescence without full knowledge of the controversy should not disqualify a plaintiff, and that defendants kept the fraudulent aspects of the transactions from the George plaintiffs. Inquiry into the state of George and LaRue's knowledge at the time the votes were taken would require detailed evaluation of their derivative claims of fraud. Such an investigation into the merits is neither appropriate nor necessary. An objective test of acquiescence, participation, or ratification is more in line with the case authorities, and may be administered more easily at this stage of factual development. Importantly, it is consistent with the reality that in evaluating potential for the leadership role of a representative, an appearance of divided loyalty may equal the fact. Moreover, a subjective test would invite "defensive" suits by miscreant insiders fearful that discovery of their perfidy is imminent. Adequacy issues must be resolved early in a suit's life. Exploring the role of each proffered representative in each disputed transaction will require either a virtual trial of the case on a "threshold" question or resolution of issues, both factually and substantively complex, without the heat of full adversary factual exploration.

*Bartels v. Newirth*, CCH Securities Law Reporter [Current Decisions] ¶ 95,918 (S.D. N.Y. September 9, 1976), provides assistance. Eight plaintiffs complained of acts occurring during the period in which one plaintiff was president and director, and another plaintiff was vice president and director of the corporation. Both plaintiffs had participated in actions they complained of in suit. They argued, however, "that they were victims of, rather than parties to, the alleged frauds. . . ." Defendant contended the two plaintiffs should also have been defendants to the action, and

indicated an intention to file counterclaims charging the plaintiffs with breaches of fiduciary duty to the corporation. The court concluded that only the plaintiffs', "bare allegations of innocence . . . distinguish them from [defendants]." The court also found the former president and vice president might well have been named as defendants had they not initiated the suit. Citing *Wright & Miller* and Professor Moore, the court applied an objective standard and concluded that all "insider" plaintiffs were estopped from suing derivatively.

(1) George and LaRue acquiesced in at least four transactions which they now challenge. Pinkston acquiesced in the Republic Securities transaction. Regardless of their protestations of ignorance as to the fraudulent nature of the schemes, under the rationale of *Bartels* they must be estopped from suing derivatively on these claims.

> "It is generally recognized that a stockholder who has acquiesced or participated in the acts giving rise to his claim has no standing to vindicate the rights of the corporation in the derivative action. . . [T]he rule is designed, among other things, to prevent speculation by the stockholder on the results of corporate transactions, with the object of accepting the advantages if they turn out well or challenging them if they are not beneficial." *Bartels*, Citing *Rosenfeld v. Schwitzer Corporation*, 251 F.Supp. 758, 762 (S.D.N.Y.1966), (Citations omitted).

George's, LaRue's, and Pinkston's inability to sue on these claims affects the forcefulness with which they can represent shareholder interests. Therefore, they must be disqualified. The Center plaintiffs, on the other hand, do not appear to be limited by these personal defenses, and so are not disqualified.

(2) Kraus and Fox charged defendants with violations stemming from the August 1 ACFC proxy statement. George and La-Rue were then members of the board and were reelected through the results of the proxy. It is not clear why the George plaintiffs did not and the Kraus plaintiffs did allege proxy violations. Putting aside the questions of whether George and LaRue individually are estopped, or could be named as defendants in this action, the differing approach to proxy violations presents a possible antagonism between the two groups of shareholders. The two plaintiffs groups should settle this between themselves.[3]

(3) In light of the above arguments, it is not necessary to decide whether George and LaRue are motivated by a desire to regain control of ACFC. Even if proven, this allegation, along with defendants' allegations as to plaintiffs' mismanagement of ACFC and GCL probably would not disqualify the George plaintiffs from bringing this suit. These charges are not substantially related to the matters at interest in this suit, and would seemly not otherwise create a conflict with the interests of other shareholders. *Wolf v. Frank*, 477 F.2d 467 (5th Cir. 1973), cert. denied 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), cf. *Blum v. Morgan Guaranty Trust Company*, 539 F.2d 1388 (5th Cir. 1976).

### B. *Kraus and Fox adequately represent the interests of the minority shareholders.*

In *Surowitz v. Hilton Hotels Corporation*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), the Supreme Court indicated that it does not matter that plaintiff's agent, rather than plaintiff, investigates the allegations, so long as plaintiff stands behind the merits of the suit. Indeed, in *Fisher v. ITT*, CCH Federal Securities Law Reporter [Current Decisions], ¶ 95,767 (E.D. N.Y. September 29, 1976), the court cited *Surowitz* for the proposition that:

> "In a stockholders' derivative action at least the United States Supreme Court has indicated quite clearly that lack of

---

**3.** George and LaRue are already disqualified. Consideration should be given to filing a single amended complaint in the consolidated cases. The court is confident that counsel to plaintiffs will reach agreement as to its content. A failure to do so may suggest antagonisms that will have to be resolved.

knowledge and interest 'cannot justify [a] court's summary dismissal' of a case." Thus, defendants' allegation that Kraus and Fox have abdicated their responsibility to manage the suit, if not irrelevant, is without more insufficient. Defendants' reliance upon *Rogosin v. Steadman*, 65 F.R.D. 365 (S.D.N.Y.1974), is misplaced. That case is distinguishable because the named plaintiff testified she did not authorize the suit, nor was she even aware of its commencement. Plaintiffs Kraus and Fox initiated this suit. They obtained competent counsel who will forcefully and vigorously pursue the action. They verified the complaint pursuant to Rule 23.1. There being no other attack, Kraus and Fox are adequate representatives of the ACFC shareholders.

## II.

### SHOULD COUNSEL FOR PLAINTIFFS BE DISQUALIFIED?

■ The Code of Professional Responsibility, promulgated by the American Bar Association, provides in pertinent part:

### CANON 4

A Lawyer Should Preserve the Confidences and Secrets of a Client

DR 4–101 Preservation of Confidence and Secrets of a Client

(b) Except when permitted under DR 4–101(c), a lawyer shall not knowingly:

\* \* \* \* \* \*

(1) Reveal a confidence or secret of his client.

(2) Use the confidence or secret of his client to the disadvantage of the client.

(3) Use the confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

"[T]he former client need show no more than the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representa-

tions confidences were disclosed to the attorney bearing on the subject matter of the representation." *T.C. Theatre Corporation v. Warner Brothers Pictures*, 113 F.Supp. 265, 268 (S.D.N.Y.1953).

This rule has been adopted in the Fifth Circuit.

"This rule rests on the presumption that the confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The court may not even inquire as to whether such disclosures were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client." *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir. 1976), reh. denied 536 F.2d 1025 (5th Cir. 1976).

The rule has been applied when an attorney sought to represent a client whose interests were adverse to his former client, such as in *Emle Industries Incorporated v. Patentex, Inc.*, 478 F.2d 562 (2nd Cir. 1973). The rule has also been applied when the attorney herself was the plaintiff and was suing a former client. Both the party and her counsel were disqualified. *Hull v. Celanese Corporation*, 513 F.2d 568 (2nd Cir. 1975). Here both McDonald, Sanders and Stewart Frazer consulted with ACFC on issues substantially related to those raised in this suit. However, fundamental reasons exist why the *Emle* presumption should not be applied in this situation.

A. *McDonald, Sanders and ACFC never had an attorney-client relationship.*

The attorney-client relationship is one of agency, the existence of which is a question of fact.

[T]he relation of attorney and client may be implied from the conduct of the parties. It is not dependent on the payment of a fee, nor upon the execution of a formal contract. *E. F. Hutton & Company v. Brown*, 305 F.Supp. 371, 388 (S.D. Tex.1969).

Defendants contend:

(1) McDonald, Sanders delivered three opinion letters concerning the proxy statement to the ACFC Board of Directors;

(2) The firm had access to the corporate documents;

(3) The firm was hired to assist in preparing the proxy for the annual meeting of ACFC in August;

(4) The board authorized on May 28 and paid on July 3 $12,686.39 to McDonald, Sanders for legal services rendered;

(5) McDonald, Sanders carried ACFC's name on its books as a client.

Plaintiffs rebut with the following:

(1) McDonald, Sanders was hired by George and LaRue to advise them on the legality of certain matters, including the possible incompleteness of the proxy statement;

(2) None of the three opinion letters were addressed to ACFC having been prepared for George and LaRue, and they were delivered at a public meeting of the board;

(3) McDonald, Sanders' only access to corporate documents was through George and LaRue, and all documents supplied by plaintiff were either public, soon to be made public, or required to be filed with a public authority;

(4) McDonald, Sanders did not work on the final proxy, and had no contact with ACFC after May 28, 1975;

(5) On June 18, ACFC rescinded its resolution to employ McDonald, Sanders because McDonald, Sanders had performed no work for ACFC after May 28, 1975;

(6) Other directors had private counsel, and five law firms were paid by ACFC for services rendered in reference to the May 28 board meeting;

(7) ACFC was under no legal obligation to McDonald, Sanders, and all fees were earned before they were paid;

(8) George and LaRue were entitled to outside counsel, and a lawyer-client relationship is not disturbed even though a third party pays the fees. *Woods v. Covington County Bank*, 537 F.2d 804, 815 n. 15 (5th Cir. 1976).

Weighing the foregoing, it is the court's judgment that Defendants failed to meet their burden of proof. They did not establish an attorney-client relationship which would engender and protect confidential communications between ACFC and McDonald, Sanders.

B. *The Court will not presume that Stewart Frazer gave information of a confidential nature to Plaintiffs' attorneys.*

The presumption in favor of disqualification conceived in *T.C. Theatres* was formulated to deal with the situation where an attorney switches sides on a common issue. That is, where an attorney represents a party against a former client on a matter substantially related to the prior representation, courts presume both that the attorney possesses confidential information, and that he will use the information adversely. Here the facts are different. Stewart Frazer, former counsel to ACFC, is not representing plaintiffs. He did, however, confer with plaintiffs and their attorneys about ACFC. Since the wrongs alleged in this action are substantially related to matters on which Frazer counseled ACFC, defendants would have the court presume plaintiffs' attorneys now possess confidential information tainted by Frazer's breach of duty.

The importance of the interests protected by CANON 4:

> require[s] application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during the previous relationship may subsequently be used to the client's disadvantage. *Emle, supra*, at 571.

Balanced against the interests articulated in CANON 4 are the interests of the client in retaining his chosen counsel. While there are practical difficulties of monitoring every "slight possibility" that confidential information may be misused, imposing a presumption of passing confidential formation to every such exchange between at-

torneys serves no compelling purpose. A limit must be set on the class to whom courts will impute such knowledge absent proof of actual receipt. Presently, the courts have included within the suspect class, and have disqualified, attorneys who have switched sides either to become counsel or to become parties themselves against former clients. This disqualification generally extends to partners and employees of the lawyer who participated in the attorney-client privilege. *American Can Company v. Citrus Feed Company*, 436 F.2d 1125, 1129 (5th Cir. 1971).

*Emle* reviewed the rationale behind disqualifying a counsel who "switched sides". *Hull, supra*, and *Richardson v. Hamilton International Corporation*, 469 F.2d 1382 (3rd Cir. 1972) involved attorneys who became plaintiffs in a multi-plaintiff suit (*Hull*) and a derivative and class action suit (*Richardson*) against their former clients. Plaintiffs were disqualified, and so were their attorneys. The theory was that the attorneys were tainted by confidential disclosures from their clients. In *Richardson*, it was not proved that the plaintiff revealed any confidences to his attorneys, but the courts presumed the breach. The court based its decision both on CANON 4, and CANON 9, the duty to avoid even the appearance of professional impropriety. In *Hull* at 570, the trial court found some confidential information had been passed from client to attorney. The appellate court held that regardless of the existence of direct proof, the attorneys must be disqualified "in order to preserve the spirit of the Code". *Id.* at 572. The danger of inadvertent use of confidential information was simply too great not to apply the *Emle* presumption.

All parties rely upon *NCK Organization Ltd. v. Bregman*, 542 F.2d 128 (2nd Cir. 1976). The suit was between a corporate officer and his former corporate employer. The plaintiff was represented both by the Weil law firm and Don Randall, former general counsel for the corporate defendant. Although the Weil firm was counsel of record, Randall consulted with and advised them. He characterized his relationship as one of co-counsel. The court, basing its decision on *Hull*, held "the possibility that breach of these confidences was committed by Randall is sufficient to make disqualification [of the Weil firm] a necessary and desirable remedy". *Id.* at 134. The plaintiff urged the court to adopt a standard requiring the defendant to prove possession and conveyance of confidences by Randall. The court rejected the standard on two grounds: (1) the defendant might have to reveal the confidences it wishes to protect in order to prove the extent of Randall's knowledge, and (2) Randall and plaintiff's confidential relationship would have been undermined by inquiring into the nature of the advice given plaintiff by Randall.

Judge Mansfield concurred in the result, but refused to disqualify the Weil law firm on *Emle* grounds "since it never had an attorney-client relationship with [defendants] and hence cannot be presumed to have come into confidential information from them . . . ." *Id.* at 135 (Mansfield concurring). Mansfield also refused to automatically disqualify the Weil firm simply because it talked to Randall. Instead, he reasoned that it was within the trial court's discretion to disqualify the Weil firm when the records showed Randall "had engaged in fairly extensive discussion of the case with the Weil firm, giving advice to that firm and to [plaintiff]." *Id.* at 136 (Mansfield concurring). The test as he saw it is:

"Whether the disqualification is to be extended to the new firm should turn on the circumstances surrounding his consultation of that firm and particularly the nature and extent of the communications between the disqualified lawyer and the new firm." *Id.* at 136 (Mansfield concurring).

Rejection of the *Emle* presumption in favor of a more rigorous standard of proof is found in *Meyerhofer v. Empire Fire & Marine Insurance Company*, 497 F.2d 1190 (2nd Cir. 1974). There plaintiff filed suit against a corporation and its former general counsel. The former general counsel met with plaintiffs' attorneys to explain why he

should not be charged as a defendant. Defendants sought to have plaintiffs' attorneys disqualified because they were "tainted" through the former general counsel's disclosures. The court denied defendant's motion. It found the former general counsel was justified in releasing the information to protect himself,[4] and in the process ruled, "The irrebutable presumption of *Emle* has no application to the instant circumstances because [the former general counsel] never sought to 'prosecute litigation' either as a party . . . , or as counsel for a plaintiff party." *Id.* at 1195.

A test similar to Judge Mansfield's strikes a better balance between the interests competing here than does the *Emle* rule. First, the two considerations listed by the majority in the *Bregman* case do not apply. That is, under *Wolfinbarger, infra,* the attorney-client "privilege" does not necessarily insure that the general counsel's testimony will be kept from these plaintiffs. Hence confidences which defendants might wish to protect may well be revealed regardless of the disqualification issue. Also, there is no attorney-client relationship between Frazer and plaintiff to disturb by an inquiry into the nature of the information imparted. Second, Frazer has never attempted to "prosecute litigation" in any role. Third, disqualification would be a severe set-back to plaintiffs' suit, and would deprive them of their chosen counsel. Therefore, little reason exists not to compel defendants to prove by a preponderance of the evidence that: (a) Frazer actually released confidential information, and (b) plaintiffs are tainted from the receipt of

that information because they could use it to the detriment of ACFC.

As stated in the summary of facts, Frazer gave some information to Newman and Thomas. He apparently did so freely and not out of a need to protect himself. However, defendants have not established the confidential nature of the "Form A", the ownership structure, or the consulting contract, or that plaintiffs' plan to use them to the disadvantage of ACFC. Nor is the nexus between Frazer and plaintiffs' attorneys, of the same dimension as in *Bregman,* which would indicate the likelihood of other, possibly confidential, disclosures. And most significantly, where former counsel becomes counsel to the other side, or a party asserting a claim against his former client, the very appearance of impropriety (as well as the likelihood of confidences being broken) underlies and warrants a presumption of breach. Defendants have failed to meet this burden.

Standing alone, *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir. 1973), suggests a rationale for not disqualifying Newman and Thomas. Under that holding, plaintiffs would be entitled to discover Frazer's "confidential information" pertaining to this suit. The Fifth Circuit held:

"Where a corporation is in suit against its stockholders on charges of acting inimically to stockholder interest, protection of those interests as well as those of the corporation and of the public require that the availability of the [attorney-client] privilege be subject to the right of the stockholders to show cause why it should

---

4. One could argue that Stewart Frazer was freed of any obligation to hold communications with ACFC in confidence, because the accusatory finger had been pointed toward him. Although Frazer was summoned by subpoena to testify in an investigation conducted by the Securities and Exchange Commission, it is not clear that such an accusation has been made, yet Frazer's conduct is as consistent with an effort to avoid accusation as in *Meyerhofer.* Because of the court's ruling otherwise, it is not necessary, to decide the circumstances under which an attorney is so freed. The court has bottomed its ruling elsewhere, because it

does not accept the precedential force of *Meyerhofer* without reservation. It is not clear when an "accused" attorney is freed of his duty to hold client confidences.

See CANON 4, DR 4–101(C)(4); ABA Opinion on Professional Ethics, 1967, pp. 1–7, 259, 486; *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1932); *Pollock v. United States,* 202 F.2d 281, 286 (5th Cir. 1953); *Application of Friend,* 411 F.Supp. 776 (S.D.N.Y.1975); *United States v. Amrep. Corp.,* 418 F.Supp. 473 (S.D.N.Y.1976); *United States v. Aldridge,* 484 F.2d 655 (7th Cir. 1973); *United States v. Bob,* 106 F.2d 37, 40 (2nd Cir. 1939).

not be invoked in the particular instance." *Id.* at 1103, 1104. J. Godbold.

It then defined "good cause" as:

"There are many indicia that may contribute to a decision of presence or absence of good cause, among them the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons." *Id.* at 1104.

This "good cause" analysis requires a balancing of the fiduciary duties owed by Frazer to the minority shareholders, against the concerns implicit in CANON 4. This court has faced this decision once before. On November 2, 1976 guided by the *Wolfinbarger* test, this court granted the George plaintiffs access to certain documents in Frazer's possession. Had the Kraus plaintiffs sought to obtain the "Form A" and the George contract from Frazer through a similar court order, they undoubtedly could have made the requisite good cause showing. Thus, granting defendants' motion to disqualify would place the court in the peculiar position of disqualifying plaintiffs' attorneys for obtaining information which, after timely showing, they would have been entitled to anyway. In other words, defendants are claiming breach of a privilege which, upon a good cause showing, would not be available to them. That is not to say that a determination of good cause under *Wolfinbarger* necessarily vitiates the conse-

quences of a premature disclosure. It is to say that as we respond to the competing, and at times clashing, tensions of a corporate officer's fiduciary duty to shareholders and his duty as counsel to maintain the confidences of the client, it must be kept in mind that it is not wholly clear who the corporate client is. In a given situation, the definition of client and the duty of disclosure may be coextensive. Indeed, it may be that the courts will ultimately view the duty to disclose as a defining element of corporate client identity. Under such a view, there would be no conflicting interest between the attorney's duty to keep silent and a duty to disclose material information (whether imposed by the common law or the various securities laws) except to the extent that the duty to disclose extended beyond existing shareholders. The *good cause* approach of *Wolfinbarger* is conceptually consistent with this approach. To argue to the contrary, one must posit that a corporate counsel may possess facts so material as to trigger a duty to disclose under the securities laws but which would not meet the good cause standard of *Wolfinbarger.* Moreover, that argument would also have to deal with the *Alexander* rule relating to the existence of the attorney-client privilege, where the privileged information relates to a completed offense as distinguished from a continuing offense or planned criminal conduct.

## THE *ALEXANDER* PRINCIPLE

The case of *Alexander v. United States,* 138 U.S. 353, 11 S.Ct. 350, 34 L.Ed. 954 (1891), involving murder, holds that communications regarding offenses already completed, made by the party alleged to have committed the offenses to an attorney at law in his professional capacity are privileged. In so doing, the court used the following words:

"Had the interviews in this case been held for the purpose of preparing his defense, or even for devising a scheme to escape the consequences of his crime, there could be no doubt of its being privileged . . . ." 138 U.S. 353, 360, 11 S.Ct. 350, 352, 34 L.Ed. 954 (1891).

The court thus rejected an argument by the government that the communications in *Alexander* were not privileged because they were done in furtherance of a crime. Moreover for the privilege to attach in the context of a completed crime, pending litigation was not required. 138 U.S. 358, 11 S.Ct. 350.

The principle is perhaps better stated in *Wigmore on Evidence* :

" . . . Looking at the reasons of policy upon which it (the attorney-client privilege) rests, they appear by their natural limits to end with the same conclusion. They predicate the need of confidence on the part not only of injured persons, but also of those who, being already wrongdoers in part or all of their cause, are seeking legal advice suitable for their plight. The confidences of such persons may legitimately be protected, wrongdoers though they have been, because, as already noticed, the element of wrong is not always found separated from an element of right; because, even when it is, a legal advisor may properly be employed to obtain the best available or lawful terms of making redress; and because the legal advisor must not habitually be placed in the position of an informer. But these reasons all cease to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*. From that point onwards, no protection is called for by any of these considerations." 8 *Wigmore on Evidence*, § 2298, p. 572 (McNaughton Rev.1961).

We are talking about counsel to the corporation. We are not talking about counsel to an individual director or officer. Defendants' arguments make no attempt to reconcile the maintenance of confidences under the *Alexander* principle and any continuing duty of disclosure arising from such congressional and administrative rules as X–10(b)–5 (with criminal sanctions for such breach). The critical inquiry in resolving these "attorney-client" problems is the identity of the client. In dealing with a disclosure by a corporate officer (who is also an attorney) to counsel to shareholders, we cannot ignore the circumstances that there may well be no attorney-client privilege at all at least as to matters otherwise "material" to shareholders. Such a result is no denigration of the attorney-client privilege. It is an application of the traditional limits of the privilege. It may well be a risk foreseeable to one who attempts to simultaneously wear more than an attorney's hat.

Disqualification of counsel for prior representation is within the discretionary power of a District Court. However, *Wolfinbarger* makes the defendants' interest in disqualification dubious at best. Nor are the policies of CANON 4 substantially enhanced by disqualifying plaintiffs' counsel, since the court has found it unlikely that Newman and Thomas in fact committed any violation of legal ethics. It is thus with the brooding presence of the reality that little would be gained, and substantial interests would be sacrificed by disqualifying Newman and Thomas, that the court denies defendants' Motion to Disqualify.

### C. *ACFC and derivative plaintiffs are not adverse parties.*

Even assuming McDonald, Sanders once represented ACFC, and that Stewart Frazer is a party in interest here so that the *Emle* presumption applies to Newman and Thomas, a final reason exists against disqualification of either plaintiffs' counsel. There is no conflict since ACFC's interests in the present suit are not adverse to the prior representation. Both Stewart Frazer and McDonald, Sanders could represent ACFC in an action against an outsider or one of ACFC's directors. Why, then, can they not represent shareholder plaintiffs in a derivative suit to bring corporate claims against individual directors?

For historical reasons, the corporation is nominally aligned as a defendant in a derivative suit. Also, if a shareholder makes demand upon the management to bring suit on a claim, and the corporation refuses, the corporation will be aligned as a defendant for purposes of diversity jurisdiction.

Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957). Unfortunately, however, the reasoning which led to this rule in diversity cases is not of benefit in analyzing the questions presented here. Realistically, antagonism exists not between the corporation and the minority shareholders, but between minority shareholders and those who control the corporate management. It is uncontested that the claims in this suit belong to ACFC. ACFC is the real party in interest. *Koster v. (American) Lumbermen's Mutual Casualty Company*, 330 U.S. 518, 522–523, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). The shareholder plaintiffs may assert the claim, but their control of the suit is subject to court approval. 3B *Moore's Federal Practice*, 23.1.-24[2] at p. 23.1–139, 141. As long as they pursue redress for ACFC, the plaintiffs are not representing adverse interests. See *Jacuzzi v. Jacuzzi Brothers, Inc.*, 218 Cal. App.2d 24, 32 Cal.Rptr. 188 (1963).

This suit differs from the facts in *Wolfinbarger*, which acknowledged management's limited interest in keeping "privileged" information from shareholders. That suit had a class action claim against the corporation in addition to derivative aspects, so the corporation was an actual as well as a nominal defendant. It faced the prospect of both paying and receiving damages. It asserted the attorney-client privilege for its own benefit. As noted, however, this is a purely derivative suit. Plaintiffs claim damages only from the individual defendants, and to accrue solely to the benefit of ACFC. To avoid liability, the individual defendants seek to invoke the shield of ACFC's privilege on their own behalf. This they cannot do. The privilege belongs to the former client alone. The defendants have no right of their own which is invaded. *In re Yarn, supra*, at 90.[5]

## CONCLUSION

George, LaRue, and Pinkston face personal defenses which conflict with their ability to adequately enforce the claims of ACFC's shareholders. They must be disqualified as representative plaintiffs, but all other plaintiffs may proceed derivatively under a single amended complaint. The court finds no prior representation problems which would disqualify either plaintiffs' attorneys.

---

5. This is not to suggest that the good cause of *Wolfinbarger* is not required in pure derivative suits. It is to highlight, by identifying the true contestants, the weak grasp of the policies of CANON 4 in this contest.