Mary ROGOSIN, Plaintiff,

v.

Charles W. STEADMAN, et al., Defendants.

Kenneth I. HERMAN, as trustee for the benefit of Sheril Esta Kupfer, Plaintiff,

v.

Charles W. STEADMAN, et al., Defendants.

Nos. 69 Civ. 2277, 69 Civ. 2660.

United States District Court, S. D. New York.

May 5, 1976.

As Amended on Reargument June 14, 1976.

Ira J. Sands, and Samuel Gottlieb, New York City, for plaintiffs.

Isadore Kupfer, and Charles Rosenthal, New York City, for plaintiff Herman.

Covington & Burlington, Washington, D.C., for defendants Steadman Security Corp. and Steadman Corp. of America; Togo D. West, Jr., Washington, D.C., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant Steadman American Industry Fund, Inc.; Mark D. Geraghty, New York City, of counsel.

Spengler, Carlson, Gubar & Churchill, New York City, for defendants Charles W. Steadman, et al.; William F. Tueting, New York City, of counsel.

## MEMORANDUM AND ORDER

OWEN, District Judge.

In my memorandum and order of December 5, 1974, D.C., 65 F.R.D. 365, I ordered a hearing into certain allegations which arose from the motion of defendants Steadman Security Corporation and Steadman Corporation of America (hereinafter "Steadman") to strike and/or dismiss the consolidated supplemental complaint as a sham and false for improper verification pursuant to Rule 11 of the Fed.R.Civ.P.

I concluded that a hearing was required under *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966) to resolve the basic issues of (1) whether the verification of the complaints in this shareholder derivative action should be stricken as sham because of the circumstances surrounding the initiation of the lawsuit; and (2) whether the named plaintiffs, Mrs. Rogosin and Mr. Herman, could adequately represent the class of plaintiff shareholders on behalf of the corporation as required by Rule 23.1 of the Fed.R.Civ.P. I held extensive hearings beginning on February 7, 1975 and continuing from time to time thereafter until March 14, 1975.

The facts which initially prompted me to hold the hearing are set out in my December 5, 1974 memorandum, but may be summarized briefly as follows.

As to the Rogosin complaint, four years after Mrs. Rogosin [1] filed her complaint, she testified at her deposition on August 15, 1973 that she had neither authorized nor was she aware that an action had been commenced in her name in May 1969 or even that it had been pending or in existence during the intervening four years.[2] Mrs. Rogosin stated that she had not verified any complaint in 1969. Her attorney, Ira J. Sands, had verified it instead, reciting that ". . . the plaintiff resides outside of the County within which my office is located and is presently not within that County." Mrs. Rogosin had, however, lived within New York City since 1967 and had, according to her testimony, her first meeting with Sands on May 22, 1973, some three months [3] before her deposition which was the first time she learned of the existence of her lawsuit—the instant action. Sands responded to these allegations by affidavit, stating that it was Arthur Rogosin, Mrs. Rogosin's husband, who was the guiding force behind the filing of his wife's complaint and that he, Sands, verified the complaint believing Mrs. Rogosin to have then resided in Baltimore, and further Sands argued that it was incumbent upon defendants to point out his error, if any, and provide him with the accurate address of his own client.

Kenneth Herman, the other named plaintiff and trustee of a trust for Sheril Kupfer, verified his original complaint in June 1969. He testified at his deposition that he was asked to file this complaint by Paul Kupfer, an attorney and Sheril's father. He stated that Kupfer brought him the complaint and prior to his verification he skimmed but did not read it and was aware only generally of its contents. He had no independent knowledge of the facts surrounding the complaint and would not have brought the action except for the request of Kupfer. Herman stated he had never met anyone from Rosenthal & Gurkin, the attorneys who filed his action, until four years later and did not meet Ira Sands, his attorney in the consolidated action, until a moment before his deposition in August 1973. Herman asserted that he was satisfied to verify the complaint based on Kupfer's representations to him. Kupfer asserted that he acted upon information of Alfred Gurkin, an attorney. Gurkin stated that it was he who did the investigating on Kupfer's behalf.

In view of these *prima facie* disturbing circumstances I set this matter down for a hearing on two issues: (1) whether either plaintiff was the motivating force in the institution of these actions; and (2) whether there was an adequate investigation performed by the attorneys or any one else on behalf of the plaintiffs before suit was commenced. I further noted that the Court must be assured

> ". . . that some person, party, attorney advisor, or otherwise has responsibly investigated the allegations at the behest of the named plaintiff, who then stands behind the merits of the complaint, and that the plaintiff is [not] . . . a puppet for others, neither instigating the action, nor having interest in or awareness of its basis."

Four witnesses testified before me. The first, Lawrence Philips, Mrs. Rogosin's per-

---

1. Mrs. Rogosin is a woman of mature years, with no business experience, having been a dutiful wife and homemaker for a domineering husband.

2. A retainer agreement she signed prior to the institution of the action was in blank when presented to her for signature.

3. From the hearing it appeared that the meeting was in fact a "couple of days" before the deposition. Sands himself on the deposition asked questions of Mrs. Rogosin, his own client, from which a reader would conclude that they had first met three months before the deposition in May ("Q: Do you recall the conversation you had with me at my office in or about May of 1973?"). He testified on the hearing, however, (see *infra*) that he knew *at the time* her answers were wrong and that they first met a mere "couple of days" before the deposition on August 15th. However, he said he deliberately perpetuated her error during the deposition itself because he stated that he felt he would be "professionally criticized" if he endeavored to correct this.

sonal attorney, although not counsel of record in this action, testified that the Rogosin litigation grew out of a social occasion in 1968 at which he mentioned to Arthur Rogosin, plaintiff Rogosin's husband, that he was involved in some stockholders' litigation involving mutual funds. Philips testified that husband Rogosin indicated that his wife held some shares in mutual funds and that he, Philips, should look into some of these funds. Philips subsequently passed the request on to Leonard Schreiber, another attorney, and then supplied Mrs. Rogosin with a blank retainer form which she signed and returned to him, the details being later furnished to him by her husband on the phone.

Philips' testimony revealed that when Mr. Rogosin asked Philips to look into the question of mutual funds, he supplied Philips with a list of some thirteen funds—apparently all the funds in which Mrs. Rogosin owned shares. This would appear to evidence either total distrust of the mutual fund industry on the one hand, or the search for a lawsuit on the other.

Attorney Leonard Schreiber testified next. He recalled receiving a telephone call from Philips in which the list of thirteen funds was relayed. Schreiber stated that because of his practice of "not backstopping"—not getting involved in mutual fund litigation already instituted by others—and because he knew offhand about most of the shareholder suits that were pending, he concluded that the Steadman funds were the only ones as to which litigation was not currently pending, and therefore concentrated his inquiry in this area. Schreiber stated that he contacted the Berdon accounting firm for a report and thereafter telephoned Philips to inform him that all of

the funds except the Steadman funds were involved in derivative suits and Philips should therefore obtain a retainer from his client as to suit against the Steadman funds (which Philips nevertheless did in blank, see *supra* ).

Schreiber indicated that he never personally investigated the Steadman funds prior to his conclusion that they were the funds for which Philips should seek a retainer from Rogosin. Schreiber also stated that the accountant's report[4] was passed directly on to *Sands*—not to Philips or the Rogosins,[5] and that, based on the accountant's report and investigation by Sands, Sands—not Schreiber—prepared and filed the complaint. Schreiber testified that he neither had a role in preparing the complaint nor was involved in any subsequent phases of the Rogosin action.

Mrs. Rogosin's husband, Arthur, next testified that it was he, and not his wife, who instituted the litigation now pending in this Court. Mr. Rogosin's testimony in substance was that Mrs. Rogosin knew neither about the complaint nor this litigation. Moreover, it is clear that Mr. Rogosin never sought nor had any intention of seeking his wife's judgment in any matters relating to the prosecution of this action and will not seek it in the future. The most that Mr. Rogosin would concede is that he may have mentioned the complaint to his wife in passing some evening.

Next, Mrs. Rogosin's attorney of record, Ira J. Sands, testified. His recollection as to the events in issue was skimpy, hazy and fragmentary at best. Asked the procedure whereby he received Leonard Schreiber's information about the case, received the accountant's report, and conducted his own

---

**4.** No evidence, written or oral, was given to the Court as to the contents of this alleged 8–12 page report, which was the claimed "genesis" of the action against the Steadman Fund. It was never exhibited on the hearing by either Schreiber, who ordered it, or Sands, who claimed to have used it to prepare the complaints. One could conclude that at least it *no longer* existed, especially since the Court's opinion directing the holding of a hearing stat-

ed that one issue on which the Court wished testimony was "the investigation . . . which motivated . . . the action."

**5.** I find it significant that the attorneys furnished neither Mrs. Rogosin, the "plaintiff," nor her husband, the instigator, with a copy of the alleged report on the merits of the lawsuit commenced in Mrs. Rogosin's name—and as it turned out—without her knowledge.

investigation, Sands had no real memory.[6] Two sheets of paper bearing notes, one in handwriting and one typed were proffered by Sands as, ". . . all I find in my file." He had no real memory of preparing the complaint. He verified it in 1969 "believing his client resided in Baltimore." He never spoke to his client until "a couple of days" before her deposition in 1973.

Viewed in its totality, I find Sands' testimony highly disturbing.[7] His claim that he never noticed that his client lived in New York rather than Baltimore, but relied on the defendants in this litigation to inform him of his own client's address is indicative of the manner in which he has handled this case. I am further disturbed by Sands' explanation concerning both the contents and the subsequent execution of Mrs. Rogosin's deposition under oath. At the hearing Sands testified that he and Larry Philips both knew her testimony was materially in error in a number of places while the deposition[8] was in progress. Yet Sands retained the transcript of the deposition for months after it had been taken without either submitting it to her for changes or advising his adversaries of known errors. Yet, even more surprisingly, when it finally was signed, sworn to and filed, no changes had been made in the transcript of the deposition by the plaintiff or her attorney. Sands testified that he and Lawrence Philips, Mrs. Rogosin's personal attorney, were also both aware that the Federal Rules of Civil Procedure provide for the procedure of correcting deposition testimony by interlineation or by letter of counsel. Sands claimed they were denied their opportunity to conform with this procedure by defendants' motion to strike the complaint. Further, Sands stated that the method chosen for the "correction" of the deposition was the filing of the affidavits of Mr. Rogosin and Lawrence Philips.[9] That explanation does not satisfy me. Particularly unsatisfactory is the fact that when Mrs. Rogosin was testifying to the date of first meeting with Sands and was materially in error, *and Sands knew it,* he knowingly fortified that error by embodying that erroneous data in his own questions eliciting further answers from Mrs. Rogosin based thereon which he knew to be wrong. Was there concern as to what Mrs. Rogosin might say if, while on the record, the error was called to her attention?[10] More serious, however, is the plain fact that Sands had no contact with Mrs. Rogosin at the time of or prior to the filing of the complaint nor for several years thereafter.

Accordingly, I conclude as follows:

1. Mrs. Rogosin instituted neither the idea of filing this lawsuit, the contacts with any attorney, the inauguration of an investigation, the preparation of a complaint, or the filing of a complaint.

---

**6.** "It is hard for me to say whether this is actual memory or reconstruction now in my mind, . . ."

**7.** This is not the first time a court has found Sands' conduct disturbing. *See Kravitz v. Callen* (unreported) 67 Civ. 3446 (S.D.N.Y.1971). The Court had "grave doubt, to put it mildly" that Sands' affirmation that he mailed an amended complaint to adversaries was true; *Korn v. Franchard Corp.,* CCH Fed.2d L.Rep. ¶ 92,845 (S.D.N.Y.1970) (a solicitation letter signed by Sands constituted "misconduct"). *See also, Taub v. Glickman,* CCH Fed.2d L.Rep. ¶ 92,874 (S.D.N.Y.1970), and *In re Four Seasons Securities Laws Litigation,* 59 F.R.D. 657 (W.D.Okl.1973).

**8.** See n.3, *supra.*

**9.** Why did Sands adopt the curious technique of having her husband file an affidavit correcting her errors to which she filed a short affidavit of assent? Why did Sands not have her file her own affidavit of corrections, or even more provokingly significant, why did Sands not have her make her corrections pursuant to Rule 30(e), Fed.R.Civ.P., giving her statement of "the reasons" for making them? The Court is entitled to and does conclude from this that she could not honestly comply without destroying her status as a derivative plaintiff.

**10.** Why should a lawyer permit (if not counsel) his client to swear to a deposition which he knew contained material misstatements and thus subject her at a later time to possible cross-examination suggesting perjury on her part? Sands conceded that her clearly erroneous testimony about May 1973 referred to a "crucial month and year . . . ."

2. Mrs. Rogosin never expressed, prior to her deposition, a desire to initiate a lawsuit.

3. Mrs. Rogosin never had the benefits of either a pretrial investigation of the merits of her husband's concerns, or of the full and effective advice of her counsel of record.

4. To date, Mrs. Rogosin does not maintain this lawsuit based on her own desires, but rather at the will and desires of her husband who did not consult with her or explain to her any matters regarding this lawsuit.

5. Mrs. Rogosin does not "stand behind" her complaint.

6. This Court has no assurance that a decision as to the continuation or termination of this lawsuit will be made either by Mrs. Rogosin or even at Mrs. Rogosin's behest.

Turning now to the Herman complaint, plaintiffs elected to call no witnesses and to offer no exhibits or testimony at the hearing. Thus, the circumstances set forth in my memorandum of December 5, 1974 have not changed. I therefore conclude that

1. Herman had no desire to nor was he a motivating factor in instituting this action. He was "satisfied to institute his action at the request of Kupfer . . .."

2. There was no showing of any investigation into the facts before a complaint issued, let alone an adequate showing of the *nature* of the investigation performed by Gurkin or Berdon or anyone else which

motivated Kupfer to direct plaintiff Herman to institute the action.[11]

3. The allegations made in the Herman complaint against these defendants were thus never subjected to an investigation sufficient to allow Mr. Herman to "stand behind" his complaint.

■ In view of the above, I cannot conclude that either of these plaintiffs have shown any requisite degree of proof that they were the motivating factors in the filing of this lawsuit, or that a responsible investigation was carried out and its results communicated to these plaintiffs sufficient to permit them to responsibly institute and stand behind the complaint.[12] Accordingly, the consolidated supplemental complaint is dismissed.

Finally, it should be noted that given Sands' conduct as revealed by all the testimony, including his own, I conclude that in any event he would not fairly and adequately represent the members of the purported class.[13]

An inquiry under the provision of the Federal Rules is broad and can extend to whatever factors are needed to assure the Court of the adequacy of the representation of the class to be represented, and raises questions both as to the plaintiff's role and role of his counsel. After an appropriately broad inquiry, *see Shields v. Valley National Bank of Arizona,* 56 F.R.D. 448, 16 F.R. Serv.2d 251 (D.Ariz.1972), 3B Moore's Federal Practice Act ¶ 23.07[1] (2d ed. 1969), it is clear that neither of the plaintiffs nor counsel meets this test.

---

**11.** In an affidavit which Sands procured and submitted on the original motion, an attorney Alfred Gurkin stated:

"When Isidore Kupfer first conferred with my firm relative to his suspicion that there were improprieties in the operation of the Steadman Fund, I undertook to conduct an examination of the available facts and applicable law to make a recommendation as to whether in our opinion, a corrective law suit would lie. Such investigation was so made. It was based upon such papers as were available to me, and included very substantial knowledge which I have acquired over a period of many, many years in shareholder fraud litigation . . ..

"The report to Mr. Kupfer was the result. The complaint was subsequently drawn by us based upon these factors as well as perhaps other intangibles . . . .."

Plaintiffs did not call Gurkin on the hearing to give the Court his "report" nor tell the Court about his "investigation."

**12.** Rule 23.1 provides: The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . . in enforcing the right of the corporation . . . . .

**13.** See n.7, *supra.*

■ The question which remains is whether or not notice of this dismissal need be given to nonparty stockholders, since a dismissal such as this is not on the merits and without notice can have no res judicata effect. *Papilsky v. Berndt,* 466 F.2d 251 (2nd Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665 (1972). The language of Rule 23.1 of Fed.R.Civ.Proc. expresses the requirement that a shareholder derivative action not be dismissed without "notice of the proposed dismissal . . . given to shareholders . . . ." This rule was promulgated to prevent collusive settlements in the case of voluntary or uncontested dismissals. *See* 7A Wright & Miller, Federal Practice and Procedure § 1839.

To be kept in mind, however, is the fact that these consolidated actions have been pending since 1969, and during those seven years no one has sought to intervene; *Partridge v. St. Louis Joint Stock Land Bank,* 130 F.2d 281, 286 (8th Cir.1942), and that they were commenced without any real knowledge or belief by any attorney or party that they were meritorious. This conclusion is clearly established on the record by the fact that notwithstanding that the plaintiffs were advised that a principal issue on the hearing would be whether they or anyone had conducted a responsible investigation, no real proof was offered on that issue at all. The alleged Berdon report (see p. 517, *supra*) was never proffered [14] and no testimony given as to its contents. No evidence was offered whatsoever as to the genesis of the Herman complaint (see n.11, *supra*). Plaintiffs did not call Gurkin on the hearing to give the Court his "report" nor tell the Court about his "investigation." Given this, one might conclude that notice was not necessary.

■ However, at some time subsequent to the institution of these actions, it appears the Securities and Exchange Commission instituted an administrative proceeding culminating in a decision of December 20, 1974, reported at CCH Fed.Sec.L.Rep. [1974–1975 Transfer Binder] ¶ 80,038, making findings and reaching conclusions adverse to the Steadman complex as to areas embraced within the complaint before me. Given this, I conclude that the contested dismissal here is not within any judicially established exception to the requirement of notice as provided by Rule 23.1. The parties are therefore directed to appear before me on May 20, 1976, at 3:30 P.M. with regard to the contents of an appropriate notice and the cost burden thereof.

The foregoing is so ordered.

### ON MOTION FOR REARGUMENT

There having been a motion for reargument, reargument is granted. However, upon such reargument, the Court's original determination is adhered to. See footnote 14 of the Amended Memorandum and Order.

So Ordered.

---

**14.** Upon motion for reargument, it was urged upon the Court that a certain eleven pages of handwriting and pasted-together statistical material marked as Plaintiff's Exhibit 21 on the hearing was, in fact, the Berdon report and the Court was urged to change its conclusion in view of this. I note that Exhibit 21 is undated and is handwritten on plain paper. It has no heading, contains no statement of authorship, and draws no conclusions whatsoever. All this is indicative of the fact that Exhibit 21 could not possibly have been the report of an established accounting firm to a lawyer, here plaintiff's counsel.

Given the foregoing, who prepared Exhibit 21, or when, and for what purpose it was prepared and thereafter proffered to the Court, I am not prepared to say. However, from its face and in light of the entire record, I conclude that Exhibit 21 is not and could not have been the Berdon report.