**In re FUQUA INDUSTRIES, INC. SHAREHOLDER LITIGATION.**

**Civil Action No. 11974.**

Court of Chancery of Delaware, New Castle County.

Submitted: July 27, 1999.
Decided: Oct. 14, 1999.
Revised: Dec. 2, 1999.

Pamela S. Tikellis and James C. Strum, of Chimicles & Tikellis LLP, Wilmington, and Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, Wilmington; of counsel: Lowell E. Sachnoff and Duane F. Sigelko, of Sachnoff & Weaver, Ltd., Chicago, Illinois; and David Schachman, of David Schachman and Associates, P.C., Chicago, Illinois; Mark C. Gardy and Judith Spanier, of Abbey Gardy & Squitieri, LLP, New York, New York; Scott Fisher, of Garwin, Bronzaft, Gerstein & Fisher, New York, New York; Curtis V. Trinko, of Law Office of Curtis V. Trinko, New York, New York; Robert I. Harwood, of Wechsler Harwood Halebian & Feffer, LLP, New York, New York, for Plaintiffs and Executive Committee Members.

Donald J. Wolfe, Jr. and Kevin R. Shannon, of Potter Anderson & Corroon, Wilmington, Delaware; of counsel: Richard M. Kirby, of Jones, Day, Reavis & Pogue, Atlanta, Georgia, for Defendants Carl E. Sanders and John B. Zellars.

R. Franklin Balotti, Anne C. Foster and Peter B. Ladig, of Richards, Layton & Finger, Wilmington,, for Nominal Defendant Fuqua Industries, Inc.

Thomas Reed Hunt, Jr. and David J. Teklits, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Defendant J.B. Fuqua.

Edward P. Welch and Randolph K. Herndon, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Defendants Charles R. Scott and Thomas N. Warner.

*OPINION*

CHANDLER, Chancellor.

In the eighth year of this protracted derivative litigation, defendants deposed the two derivative plaintiffs in whose names this litigation is prosecuted, Virginia Abrams and Alan Freberg. In the course of the depositions, defendants determined that Abrams and Freberg were unfamiliar with many of the facts and allegations involved in this lawsuit. Defendants now point to plaintiffs' alleged unfamiliarity and ask this Court to disqualify Abrams and Freberg because they cannot adequately and fairly protect the interests of Fuqua Industries, Inc. and its shareholders as mandated by Rule 23.1. The question I must answer is whether I should disqualify a derivative plaintiff who is unfamiliar with the basic facts of his or her lawsuit and who exercises little, if any, control over the conduct of such suit?

In order to meet the adequacy requirements of Rules 23 or 23.1, a representative plaintiff must not hold interests antagonistic to the class, retain competent and experienced counsel to act on behalf of the class and, finally, possess a basic familiarity with the facts and issues involved in the lawsuit. Defendants do not allege that either Abrams or Freberg is burdened by a disabling conflict of interest; nor do they allege that class counsel is incompetent or inexperienced. Rather, defendants predicate their entire claim on plaintiffs' alleged ignorance of the lawsuit's facts. Because I find that plaintiffs are sufficiently familiar with the facts of the lawsuit prosecuted in their names, I deny defendants' motions.

## I. BACKGROUND

These cases are musty with age and neglect. Mrs. Abrams filed her first complaint in February 1991. Consolidated soon thereafter with two other complaints, plaintiffs filed a consolidated amended derivative and class action complaint naming directors of Fuqua and its principal shareholder, Triton Group, Inc., as defendants.[1]

---

1. Fuqua was a Delaware corporation involved principally in sporting goods, lawn and gar-

Approximately four years and nearly thirty continuances later, plaintiffs filed a second amended complaint in December 1995.

The second amended complaint alleged what was described by defense counsel in oral argument as a "dog's breakfast" of fiduciary breaches and various other wrongful or illegal conduct. The foundation of this multitude of alleged wrongs was a claim that Triton and Fuqua's directors engaged in a series of transactions designed to entrench Fuqua's board. In May 1997, this Court dismissed all of plaintiffs' class claims and all their derivative claims save one. The surviving derivative claim concerns the decision of Fuqua directors to exempt Triton from 8 *Del. C.* § 203 and to repurchase 4.9 million Fuqua shares, both for the alleged purpose of increasing Triton's control over Fuqua, entrenching Fuqua's board and, consequently, denying Fuqua shareholders a change of control premium.

## II. CONTENTIONS OF THE PARTIES

Shortly after plaintiffs filed their third amended complaint in 1998 against Fuqua and six former directors of Fuqua, defendants moved to disqualify Abrams and Freberg as inadequate plaintiffs to prosecute this derivative action. Narrowly stated, defendants contend that because plaintiffs are demonstrably unfamiliar with many of the facts and allegations of the suit prosecuted in their names and because they exercise little, if any, control over the suit, they should be disqualified as derivative plaintiffs on adequacy grounds.

Defendants point to the deposition testimony of Abrams and Freberg. This testimony, defendants allege, demonstrates that plaintiffs are fatally ignorant of the issues and allegations in the pleadings. Moreover, defendants contend that plain-

tiffs are not the "driving force" behind this litigation and have ceded control of the lawsuit to their attorneys. These two alleged defects, argue defendants, make Abrams and Freberg inadequate derivative plaintiffs.

Plaintiffs insist that they have a perfectly good lay understanding of the issues in this case. Furthermore, they complain that defendants seek to set the adequacy bar much too high. In the plaintiffs' view, the defendants' motion is nothing more than a last ditch effort to avoid the merits of the sole surviving issue in this lawsuit.

## III. PLAINTIFFS ABRAMS AND FREBERG AND THE PROSECUTION OF THE LITIGATION

The defendants' motion requires an examination of the roles played by Abrams and Freberg throughout this litigation. I will briefly set forth a factual history.

Mrs. Abrams has held Fuqua shares (since converted to Metromedia) for over thirty years. The quantity of her holdings has ranged from as much as 12,008 Fuqua shares to the current level of 8000 Metromedia shares. The decision to purchase Fuqua shares, as most all of Abrams' investment decisions, was made jointly with her husband, Burton Abrams, a retired trial attorney.

In an affidavit, Mr. Abrams states that before the institution of this action, he directed a number of oral and written communications to Fuqua officers and directors complaining of managerial misconduct. After receiving no responses or dismissive responses, Mr. and Mrs. Abrams decided to pursue legal redress. In light of Mr. Abrams' experience as an attorney, he apparently took primary responsibility for finding and communicating with counsel to represent Mrs. Abrams.

den equipment, and photo finishing. In 1993, Fuqua changed its name to Actava Group, Inc. and two years later merged with three other companies in a four-way stock-swap merger. The result, a global communica-

tions, entertainment, and media company, is known as Metromedia International Group, Inc. This action, however, arises from certain actions taken by Fuqua's directors before its merger.

During the long pendency of this litigation Mrs. Abrams fell ill. As she concedes, her memory and faculties have suffered as a result. In a 1998 deposition, it was evident that Mrs. Abrams lacked a meaningful grasp of the facts and allegations of the case prosecuted in her name. While at times she appeared able to provide a general understanding of her claim, she was unable to articulate the understanding with any particularity and she was obviously confused about basic facts regarding her lawsuit.

Mrs. Abrams deposition testimony suggests an attention span deficit and fatigue. More troubling then her confusion about certain facts and allegations in the pleadings, however, was the conduct of Abrams' attorney in defending the deposition. Through the use of frequent interruptions, objections, hints, handwritten notes, gestures to documents, leading questions, unauthorized counseling, and even direct testimony asserted on behalf of Abrams, her attorney improperly hampered opposing counsel's efforts to gather evidence. In so doing, her attorney did neither himself, nor his client, any service. I will address Abrams' attorney's abuses and indiscretions during the Abrams deposition later in this Opinion.

Alan Freberg, the second derivative plaintiff in this action, purchased twenty-five Fuqua shares in 1989. In 1991, presumably upon concluding that Fuqua directors and Triton had engaged in self-dealing transactions (for the complementary purposes of enriching Triton and Fuqua directors at the expense of public shareholders and entrenching Fuqua's directors) and that they had no intention of auctioning Fuqua, Freberg retained counsel and filed his first complaint. Freberg's complaint was amended and consolidated with the Abrams complaint.

Freberg's deposition testimony evidences that his knowledge of the case is at best elliptical. Defendants argue that before his "cram" session immediately before the deposition, Freberg knew absolutely nothing about this matter and had not even been privy to the third amended complaint. Defendants also point out (with much scorn) Freberg's general ignorance of the six or seven other lawsuits in which he was, or still is, the named representative plaintiff. The subtext of defendants' motion is that Freberg has no knowledge of this case because he has no real economic interest at stake. In defendants' view, Freberg is a puppet for his fee-hungry lawyers.

## IV. ADEQUACY REQUIREMENTS FOR DERIVATIVE PLAINTIFFS [2]

As defendants correctly point out, the Court of Chancery has held that a derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity.[3] The Court elaborated upon this broad statement by listing eight factors to be considered in evaluating the adequacy of a representative plaintiff:

---

**2.** Unlike Rule 23.1 of the Federal Rules of Civil Procedure, Chancery Court Rule 23.1 does not explicitly include an adequacy requirement. In *Katz v. Plant Industries,* the Court held that the adequacy requirement of Federal Rule 23.1 also applies to Court of Chancery Rule 23.1 as the adequacy language of the federal rule made explicit what was already "implicitly a part of the federal as well as Delaware rule." *Katz v. Plant Industries, Inc.,* Del. Ch., C.A. No. 6407, Marvel, C., 1981 WL 15148 (Oct. 27, 1981). Moreover, analysis of adequacy requirements is general-

ly the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1. *See Lewis v. Curtis,* 671 F.2d 779 (3d Cir.1982); *G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,* 517 F.2d 24 (1st Cir.1975).

**3.** *Katz v. Plant Industries, Inc.,* Del. Ch., C.A. No. 6407, Marvel, C., 1981 WL 15148 (Oct. 27, 1981).

(1) economic antagonisms between the representative and the class;

(2) the remedy sought by plaintiff in the derivative litigation;

(3) indications that the named plaintiff was not the driving force behind the litigation;

(4) plaintiff's unfamiliarity with the litigation;

(5) other litigation pending between plaintiff and defendants;

(6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;

(7) plaintiff's vindictiveness toward defendants; and

(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.

These eight factors were first set forth by the United States Court of Appeals for the Sixth Circuit in *Davis v. Comed, Inc.*[4] The difficulty with the eight factors is that while many courts have cited them, it is far from clear how many factors must be present to find a representative plaintiff inadequate and how the factors should be weighed.[5]

Defendants rely on *Youngman v. Tahmoush*[6] for the proposition that a derivative plaintiff may be deemed inadequate upon a strong showing of just *one* of these factors. But a close examination of *Youngman* proves this reading somewhat selective. Actually, the *Youngman* Court stated that while the eight factors from *Davis* have been frequently combined to provide the basis for a court's decision to dismiss, "often a strong showing of one factor which is *actually inimical* to the class will permit the same conclusion."[7]

In my view, *Youngman's* analysis of adequacy requirements is inapposite to defendants' argument. Rather, *Youngman* stands for the proposition that if a derivative plaintiff is to be disqualified by a strong showing of only one factor, that factor must involve some conflict of interest between the derivative plaintiff and the class. The *Youngman* Court proceeded to elucidate this conclusion by discussing a number of federal court decisions involving conflicts of interest between derivative plaintiffs and the corporation they purport to represent or, alternatively, cases where representative plaintiffs are using derivative litigation as leverage for some other end.[8]

Court of Chancery decisions that most closely address the narrow question before me today are *Iseman v. Liquid Air Corp.*[9] and *Kahn v. Household Acquisition Corp.*[10] In *Iseman,* an elderly plaintiff, Mrs. Iseman, sued for fiduciary breaches at the behest of her son, Gruenberg, a stock broker and also a holder of Liquid Air stock. In Iseman's deposition, it appeared clear that she knew little about the litigation. Shortly after the "ordeal," his mother went through during the deposition, Gruenberg moved to intervene as a named plaintiff.[11]

In the meantime, defendants argued that Iseman should be denied class certifi-

---

4. 619 F.2d 588 (6th Cir.1980)

5. The Court in *Davis* recognized this difficulty, stating that "[t]ypically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1." *Davis* at 593.

6. Del. Ch., 457 A.2d 376 (1983).

7. *Youngman* at 380 (emphasis added).

8. *Youngman* at 380–81.

9. Del. Ch., C.A. No. 9694, Berger, V.C., 1993 WL 40048 (Feb. 11, 1993).

10. Del. Ch., C.A. No. 6293, Brown, V.C., 1982 WL 8778 (Jan. 19, 1982).

11. Gruenberg indicated that he did not initially want to be a named plaintiff for fear of reputational damage associated with maintaining this type of lawsuit for someone in his profession.

cation "because of her demonstrated lack of familiarity with the litigation and the issues surrounding the merger and because of a memory disorder for which Iseman was taking medication at the time of her deposition."[12] The Court denied defendant's motion, holding that "Iseman always relied upon her son for investment advice. Gruenberg assisted his mother in the decision to bring this action and now has become a party himself. Under these circumstances, I find that Iseman, with the assistance of Gruenberg, is an adequate class representative."[13]

*Kahn v. Household Acquisition Corp.* also involved an elderly derivative plaintiff who freely admitted she had no knowledge of the facts on which her lawsuit was based, had not reviewed the complaint at the time it was filed and had not read the proxy materials disseminated in connection with the challenged merger. Like Iseman, Kahn relied on the support and advice of her family in matters financial and legal. Specifically, Kahn's husband and three sons were investment professionals who closely counseled her and protected her interests with respect to the matter before the Court. Based on these facts, the Court granted class certification.[14]

■ Under *Iseman* and *Kahn*, the Court of Chancery will not bar a representative plaintiff from the courthouse for lack of proficiency in matters of law and finance and poor health so long as he or she has competent support from advisors and attorneys and is free from disabling con-

flicts. This conclusion is both just and sensible.

Although Delaware courts have not developed a specific test for a derivative plaintiff's required level of familiarity and control of litigation, the federal courts have spoken. Unfortunately, the federal courts are divided on the issue. One can find federal court decisions that dismiss class or derivative suits or deny certification, on the ground that a representative plaintiff did not stand behind the litigation in a meaningful way.

Defendants point to *Rothenberg v. Security Management Co., Inc.*[15] and *Mills v. Esmark, Inc.*[16] The *Rothenberg* Court found a derivative plaintiff inadequate on grounds that the complaint was not filed at the plaintiff's request, the plaintiff repeatedly testified that she had no personal knowledge of the factual basis of the complaint and had no intention of obtaining such knowledge and, finally, that the plaintiff admitted in deposition testimony that her lack of personal knowledge about the facts of the case rendered her unable to fairly and adequately represent the interests of the corporation in the derivative suit. The *Mills* Court similarly disqualified a derivative plaintiff for her total unfamiliarity with the litigation, as well as her lack of oversight and control of the suit prosecuted in her name.

The preponderance of federal authorities, however, downplays or entirely ignores a requirement that a representative

12. *Iseman* at 3.

13. The Court also stated that but for Gruenberg's intervention, Iseman's demonstrated ignorance and lack of oversight of the litigation "would be of serious concern." *Iseman* at 3.

14. Class certification was granted with some reluctance as the Court imposed three unique demands upon the named plaintiff: (1) a showing of financial means necessary to cover the projected expenses of giving notice and to otherwise efficiently and informatively continue the litigation; (2) an understanding that proof of any act by her husband or sons

connected with the litigation would be considered as her act for the purpose of deciding whether or not she would be permitted to continue as class representative; and (3) no proposed settlement would be scheduled or noticed for a hearing unless Kahn first appeared before the Court and satisfied the Court as to her knowledge of the situation and the reasons for recommending any proposed settlement on behalf of the class. *Kahn* at 6.

15. 667 F.2d 958 (11th Cir.1982).

16. 573 F.Supp. 169 (N.D.Ill.1983).

plaintiff control or even understand the lawsuit prosecuted in her name on behalf of a class or corporation. Plaintiffs cite *Surowitz v. Hilton Hotels, Corp.* as the seminal case this Court should follow on Rule 23.1 adequacy requirements.[17] The facts of *Surowitz* are noteworthy. Mrs. Surowitz, a Polish immigrant with no formal education who spoke little or no English, purchased shares of Hilton Hotel Corp. at the behest of her son-in-law. When Surowitz stopped receiving dividend checks and discovered that her shares had substantially decreased in value, she informed her son-in-law, Mr. Brilliant.[18] Upon investigation, Brilliant determined that Hilton had likely violated federal securities laws and essentially filed and prosecuted a lawsuit on his mother-in-law's behalf.

Before Hilton filed an answer, the district court granted Hilton leave to depose Surowitz. In the course of that deposition, it became apparent that she had no real knowledge of the complaint, thus calling her verification of the complaint into question. The district court dismissed her case on this basis and the court of appeals affirmed.

Justice Black, writing for a unanimous Supreme Court, reversed the lower court decision, holding that in verifying the complaint initiating the action, Surowitz's reliance on her son-in-law was not grounds for dismissal. Justice Black emphasized that it was Surowitz who "discovered" her cause of action and brought it to the attention of her trusted son-in-law who prosecuted the case with diligence and good faith.

Where the United States Supreme Court touched on the insignificance of a derivative plaintiff's understanding and control of a litigation, the Third Circuit Court of Appeals has said as much quite explicitly. In *Wetzel v. Liberty Mutual Insurance Co.,*[19] the Court set forth the test for adequacy of a named or derivative plaintiff in the following terms: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."[20] Conspicuously absent from this formulation are requirements that representative plaintiffs "understand," "control," or act as the "driving force" behind the litigation.

In *Lewis v. Curtis,*[21] Judge Collins Seitz referenced the test set forth in *Wetzel* approvingly and strongly discounted the importance of a representative plaintiff's knowledge of and control over the case:

At his deposition, taken over four months after he verified the complaint, [plaintiff] Lewis displayed a complete ignorance of facts concerning the transaction that he was challenging. The directors argue that plaintiff shareholder cannot fairly and adequately represent the interests of the other shareholders unless he has knowledge of the material facts in support of his claim. There are certainly cases that support such a requirement. See *Roussel v. Tidelands Capital Corp.,* 438 F.Supp. 684, 688 (N.D.Ala.1977). See also *Apanewicz v. GMC,* 80 F.R.D. 672, 679 (E.D.Pa.1978). We do not believe, however, that such a requirement makes vigorous representation of the class any more likely. The adequacy-of-represen-

---

**17.** 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

**18.** By way of background, the Supreme Court noted that Mr. Brilliant was a professional investment advisor, a Harvard Law School graduate with a MS in Economics from Columbia University, who just happened to represent the United States at the Nuremberg trials. The Court was obviously impressed

with Mr. Brilliant as it discussed his *curriculum vitae* at some length.

**19.** 508 F.2d 239 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

**20.** *Wetzel* at 247.

**21.** 671 F.2d 779 (3d Cir.1982).

tation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel. We believe that the requirements in *Wetzel* are sufficient to insure adequate representation and decline to require anything further.[22]

Under Judge Seitz's formulation, the role of the derivative plaintiff is negligible if not superfluous. In fact, the test fashioned by the Third Circuit and followed by what appears to be a preponderance of federal courts[23] merely requires plaintiffs to show up to the courthouse with shares of company stock while the lawyers adduce evidence of director misconduct. This view may be realistic to the extent it recognizes that lawyers, and not plaintiffs, manage complex litigation. Nevertheless, I think this view is somewhat out of balance.

Defendants' attack on Abrams' and Freberg's adequacy raises serious concerns. The allegation that attorneys bring actions through puppet plaintiffs while the real parties in interest are the attorneys themselves in search of fees is an oft-heard complaint from defendants in derivative suits. Sometimes, no doubt, the allegation rings true.

■ By the same token, however, the mere fact that lawyers pursue their own economic interest in bringing derivative litigation cannot be held as grounds to disqualify a derivative plaintiff. To do so is to impeach a cornerstone of sound corporate governance. Our legal system has privatized in part the enforcement mechanism for policing fiduciaries by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs. In so doing, corporations are safeguarded from fiduciary breaches and shareholders thereby benefit. Through the use of cost and fee shifting mechanisms, private attorneys are economically incentivized to perform this service on behalf of shareholders.

To be sure, a real possibility exists that the economic motives of attorneys may influence the remedy sought or the conduct of the litigation. This influence, however, is inherent in private enforcement mechanisms and does not necessarily vitiate the substantial beneficial impact upon the conduct of fiduciaries.

Nonetheless, in some instances, the attorney in pursuit of his own economic interests may usurp the role of the plaintiff and exploit the judicial system entirely for his own private gain. Indeed, the Court in *Rothenberg v. Security Management Co.*[24] and *Rogosin v. Steadman*[25] dismissed derivative actions when defendants demonstrated that derivative plaintiffs were not even aware of the complaints filed in their name. Such extreme facts call for the

---

**22.** *Lewis* at 789.

**23.** See, *e.g.*, *Snider v. Upjohn Co.*, 115 F.R.D. 536, 541 (E.D.Pa.1987) (stating that the Third Circuit has recognized that class counsel, not the named plaintiff, directs and manages the class action); *George v. LeBlanc*, 78 F.R.D. 281, 285 (N.D.Tex.1977) (holding that defendant's allegation that derivative plaintiffs have abdicated their responsibility to manage the suit, if not irrelevant is, without more, insufficient); *Morris v. Transouth Financial Corp.*, 175 F.R.D. 694 (M.D.Ala.1997) (holding "the law does not demand, that a class representative understand the intricacies of finance and law before he or she is an acceptable class representative. It is not a requirement that representative plaintiffs have specific knowledge of the claims and issues in the action or that they play a personal role in the direction and management of the action."); *Kaplan v. Pomerantz*, 131 F.R.D. 118, 122 (N.D.Ill.1990) (granting class certification and holding that the court is "in general agreement with *Hernandez v. United Fire Ins. Co.*, 79 F.R.D. 419, 426–28 (N.D.Ill.1978), in which [the court] expressed skepticism about any universal requirement that the named plaintiff in a class action must demonstrate familiarity with the underlying facts .... Adoption of defendants' position would convert the class action into a device usable only by individuals with such a degree of sophistication that they would be capable of acting as their own attorneys.").

**24.** *See* n. 15, *supra*.

**25.** 71 F.R.D. 514 (S.D.N.Y.1976).

court to exercise its discretion and to curb the agency costs inherent in private regulatory and enforcement mechanisms. These agency costs should not be borne by society, defendant corporations, directors or the courts.

## V. ADEQUACY OF ABRAMS AND FREBERG

■ I cannot say that either Abrams or Freberg is an inadequate plaintiff in this case. Contrary to defendants' assertions, Freberg does in fact understand the basic nature of the derivative claims brought in his name, even if barely so. As I have repeated throughout, this case has a drawn-out procedural history. When questioned about many of the specific allegations in various iterations of the complaint at issue, particularly the first version filed nearly ten years ago, Freberg confused the timing of the claims as well as some of the factual information supporting them. Still, he was able to articulate a basic understanding of the entrenchment claim and the facts supporting it.

As defendants have adduced no evidence that Freberg has interests antagonistic to the interests he purports to represent, or that class counsel is incompetent or inexperienced, I conclude that Freberg meets

Rule 23.1's minimum adequacy requirements. Interestingly, much of defendants' brief is devoted to demonstrating Freberg's surprising level of ignorance with respect to *other* lawsuits in which he is a representative plaintiff. For better or worse, however, no limit exists on the number of lawsuits one individual can bring in a lifetime.[26] Thus, this fact alone is insufficient to disqualify Freberg. A plaintiff's credibility, however, is always at issue and is always of paramount concern to the Court in reaching every decision.[27]

Like Mrs. Surowitz with the aid of her son-in-law, Mrs. Abrams discovered her injury and filed this lawsuit with the aid of her husband.[28] Even though the defendant in *Surowitz* demonstrated that Mrs. Surowitz did not "understand" her complaint and did not make any decisions with respect to the prosecution of the litigation, a unanimous Supreme Court did not dismiss her case; nor did it disqualify her as an inadequate plaintiff. I am reluctant to do differently here.

Abrams has been a substantial holder of Fuqua stock for thirty years. When she and her husband grew dissatisfied with Fuqua management, Mr. Abrams wrote letters to Fuqua's board demanding that certain measures be taken to improve the

---

26. *See, e.g., Kahn v. Icahn,* Del. Ch., C.A. No. 15916, Chandler, C., 1998 WL 832629 (Nov. 12, 1998), mem. op. at n. 1.

27. I consider Freberg's role in this litigation troubling for reasons that illustrate the importance of a plaintiff's credibility. My disquiet is grounded in three facts: (1) Freberg purchased shares of Fuqua with knowledge, as evidenced in his deposition, that Triton owned 16.4% of Fuqua, intended to increase its stake, and had already entered into the § 203 agreement with Fuqua; (2) Freberg only purchased twenty-five shares of Fuqua; and (3) Freberg's uncanny zeal for derivative litigation. Although defendants have not argued as much, and there is not a precise factual record to support such a conclusion, it certainly appears that Mr. Freberg purposefully availed himself of the role of shareholder plaintiff. A basic knowledge of fiduciary principles coupled with extensive experience in derivative litigation surely enables one to detect a transaction that might establish a *prima facie* claim of fiduciary breach (*e.g.,* a creeping acquisition in which target directors and significant shareholders hold equity positions in the acquiring company, as is the case here). Perhaps having seen the handwriting on the wall, Freberg purchased twenty-five shares, waited for Triton to increase its position in Fuqua then proceeded to file suit, consequently adding this matter to his stable of other derivative and class suits. Defendants do not specifically allege, and I certainly cannot conclude, that Freberg is in cahoots with his counsel to generate class and derivative litigation in bad faith. Yet when a person jumps in the ocean and then complains of getting wet, one certainly has to wonder.

28. While Mr. Abrams may not cut as dashing a figure as Mr. Brilliant, he has sixty years experience as a trial lawyer and has generally served as steward of the Abrams' investments.

company's share price. His letters were disregarded. Determining that she had suffered legally cognizable harm, Mr. and Mrs. Abrams retained counsel in an effort to redress their grievances. They placed their trust and confidence in their lawyers as clients have always done.

■ Our legal system has long recognized that lawyers take a dominant role in prosecuting litigation on behalf of clients. A conscientious lawyer should indeed take a leadership role and thrust herself to the fore of a lawsuit. This maxim is particularly relevant in cases involving fairly abstruse issues of corporate governance and fiduciary duties.

■ Our law, however, will not tolerate a lawyer supplanting a witness in a deposition. This is precisely what Abrams' lawyer did throughout her deposition. His actions were not only discourteous, they contravened Court of Chancery Rule 30 governing depositions.[29] His interruptions, interference and mid-deposition coaching are all over the face of the Abrams deposition transcript:

Q: Do you recall having settlement discussion in 1997?

A: 1997, no, I don't.[30]

[Deleted.]

Q: You don't recall any settlement discussions in 1997?

Abrams' Atty.: The witness said she may have.

By the WITNESS:

A: I may have.

Mr. Herndon[31]: He just changed her testimony again because what you said—you should allow her to answer and leave the record be so the record is clear what she is testifying to.[32]

In another instance, when Abrams' testimony ran astray, her attorney pointed out her answer:

Q: Could you tell me, in the May 17, 1989 letter what you were attempting to accomplish by writing to Fuqua?

[Deleted.]

A: Now what are you asking me? Why [Mr. Abrams] wrote this letter?

Mr. Herndon: Could you just repeat the question? Read it back, please. (WHEREUPON, the record was read by the reporter as requested.)

By Mr. Herndon:

Q: Before you answer that question, could you tell me what your attorney just pointed to?

A: He pointed to the last paragraph.

Q: And what does the last paragraph read?

A: "It is nigh time to consider the shareholders. The fiduciary responsibility of the board of directors' demands and dictates that it take the necessary steps to enhance the shareholder's investment."[33]

In another example of Abrams' attorney's interference with defendant's deposition, he attempts to surreptitiously guide

---

29. Court of Chancery Rule 30 provides in pertinent part: "From the commencement until the conclusion of a deposition, including any recesses or continuances thereof of less than five calendar days, the attorney(s) for the deponent shall not: (A) consult or confer with the deponent regarding the substance of the testimony already given or anticipated to be given, except for the purpose of conferring on whether to assert a privilege against testifying or on how to comply with a court order, or (B) suggest to the deponent the manner in which any questions should be answered. A party may instruct a deponent not to answer only when necessary to preserve a privilege,

to enforce a limitation on evidence directed by the Court, or to present a motion under paragraph (d)(3)." Court of Chancery Rule 30(d)(1).

30. Abrams at 178.

31. Mr. Herndon is defendants' counsel who conducted the Abrams deposition.

32. Abrams at 179–180.

33. Abrams at 79–80.

Abrams' responses to Herndon's questioning:

> Q: There is a reference saying, "I am appending the recommendation of the Shearson analysts..."
>
> Mr. Herndon: I don't have a problem with you perhaps writing things on the documents, but I do have a problem writing for her to give an answer then erasing what you wrote.
>
> The Witness: He wrote "good."[34]

Abrams argues that her attorney's interruptions and overreaching conduct are "exaggerated" by defendants and did not happen during crucial parts of her testimony. I note that by calling defendants' assertions "exaggerations," Abrams disputes the import, but not the veracity, of such assertions. Furthermore, I cannot agree that defendants overstate the extent of Abrams' attorney's improper behavior. The deposition transcript speaks for itself. The examples excerpted above are merely a sampling of numerous speaking objections and off-the-record consultations employed by him during the course of the deposition.

By wrongfully obstructing defendants' deposition of Abrams, her attorney not only frustrated defendants' ability to gather and present evidence, but he also undermined this Court's fact-finding ability. In so doing, he forces me into the awkward position of having to construe tainted testimony in a light least favorable to his client. That is to say, when Herndon asked Abrams a question and her attorney prevented her from answering or, alternatively, provided the answer for her, I can only assume that she could not have answered the question satisfactorily on her own.

 When counsel acts in bad faith during the course of litigation or willfully abuses the judicial process, this Court has the inherent power to assess fees and costs.[35] Thus, I direct Abrams' counsel to pay the defendants' costs incurred in conducting the Abrams deposition.

Despite her attorney's inappropriate coaching of the deponent, Abrams was at times quite lucid and able to independently communicate the basic facts and claims underlying her lawsuit. She did not know the particulars. As she repeatedly testified, legal and financial matters were left in the care of her husband, a retired trial attorney who has acted on her behalf in this capacity throughout their marriage. What is more, defendants have not proffered evidence that Abrams has interests in conflict with the corporation. Thus, while Abrams' attorney acted inappropriately in the Abrams deposition, nothing suggests that he is inexperienced or less than competent in shareholder litigation. I find that Abrams also meets Rule 23.1's minimum adequacy requirements.

Abrams is elderly and has suffered health problems in recent years. While her lawyers sat on her claim, her health and memory have deteriorated and now she cannot remember very many things about her lawsuit. I do not fault her for this. Her lawyers may indeed have been remiss in not pressing her claim more diligently. Simply because an elderly and not entirely healthy plaintiff does not have the stamina to constantly monitor her lawyers, I cannot, for this reason, dismiss her potentially meritorious claim.

I also note that defendants have not suffered any great burden throughout the course of plaintiffs' requests for repeated continuances. If they had, they need only have spoken up and the Court would have gladly pressed the matter with greater urgency. Defendants, in this fashion, were perhaps complicit in neglecting the matter

---

34. Abrams at 126.

35. *See Eberly v. Eberly*, Del.Supr., 489 A.2d 433, 449 (1985) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).

before the Court. This case has indeed sat far too long. It is time to reach the merits and bring it to a close.

## VI. CONCLUSION

I deny defendants' motions to disqualify Virginia Abrams and Alan Freberg as representative plaintiffs in this action.

IT IS SO ORDERED